STEVEN CLARK, Plaintiff-Appellant, v. PENN VERSATILE VAN, Defendant-Appellee (The Roscoe Company *et al.*, Defendants).

First District (4th Division)   No. 1—88—1597

Opinion filed April 19, 1990.

Michael W. Rathsack, of Chicago, for appellant.

Fraterrigo, Best & Beranek, of Chicago (Fredrick J. Fraterrigo, Keith G. Dronen, and Kevin G. Nedved, of counsel), for appellee.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Plaintiff Steven Clark (Clark) appeals, pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)), from summary judgment for defendant, Penn Versatile Van (Penn), in an action to recover damages for personal injuries under theories of negligence and strict tort liability.

Clark filed a six-count amended complaint against Penn, The Roscoe Co. (Roscoe) and Z. Frank, Inc., for injuries he sustained while riding in a van designed and manufactured by Penn and sold to Roscoe by Z. Frank. Those counts of the complaints directed against Roscoe and Z. Frank remain pending in the trial court and are not at issue in this appeal.

The facts as alleged in counts II and VI of Clark's complaint and taken from the deposition testimony are as follows. Clark was a sales representative from the Philadelphia office of Pace Corporation, a company which markets commercial soap products through other companies, such as Roscoe, an industrial laundry service. Pursuant to a contract between Pace and Roscoe, one of Clark's job responsibilities

while in Chicago was to accompany Roscoe's drivers on their sales routes to train them in the techniques of promoting Pace products. Clark had been in Chicago for this purpose two weeks before the events at issue and was completing a second, five-day trip when the injurious incident occurred.

Each day, Clark rode with a different driver in the driver's designated van. All of the vans were substantially identical and were the same type used by most industrial laundry services. The vans were commonly referred to as "step vans" because there is a step approximately midway between the outside ground level and the inside floor on the right side of the vehicle. The doors on the driver's side were bolted closed to prevent the drivers from stepping out into traffic. The driver entered and exited the van through the right-side sliding door. Seating in the van was limited to a driver's seat; there were no seats for passengers, nor were there any handrails or handgrips. The inside of the van consisted of a cab compartment and a rear cargo area which could be closed off by a sliding door which ran horizontally on a half-inch track directly behind the cab area. The motor was housed in a compartment which was to the right of the driver inside the cab. The floor was made of steel and was grooved but level.

On the morning of June 29, 1984, the final day of his second trip to Chicago, Clark met the driver with whom he was to ride for the day. On all prior occasions, personnel from Roscoe had provided him with a stool or folding chair on which to sit while riding in the van. On that date, however, the driver was unable to find anything on which Clark could sit. Although Clark periodically sat on the motor compartment, he was able to do so for only short periods because the housing became very hot. Consequently, he stood in the van most of the day. He balanced himself at stops, starts and turns by pressing the palm of his hand against the ceiling of the van.

As they were travelling to the final stop of the day, a car cut in front of the van, causing the driver to brake abruptly. Clark lost his balance and was propelled backward. The heel of his shoe became caught in the track of the sliding door. As a result, his body twisted around and he fell onto his right knee on the floor of the cargo area. Clark subsequently underwent three surgical procedures to repair the damage to his knee.

According to the deposition testimony of the driver of the subject van, another route driver and the vice-president of Roscoe, unauthorized passengers were not allowed to ride in the vans. However, it was common practice for newly hired drivers to accompany experienced drivers for a 30-day training period and for supervisors to ride with

drivers for evaluation purposes or to familiarize them with new routes. On such occasions, the passenger usually sat on a stool next to the right-side sliding door. Pace sales representatives were authorized to ride in the vans and continued to do so after the incident at issue.

After arguments by counsel, the trial court found that the van was not unreasonably dangerous and granted Penn's motion for summary judgment. Clark's timely appeal followed.

OPINION

Clark contends that the trial court erred in granting summary judgment for Penn because a genuine issue of material fact existed as to whether the absence of a passenger seat and handgrip constituted a defective and unreasonably dangerous condition of which Penn failed to warn, despite the foreseeability of injuries as a result of this defect to persons Penn knew or should have known would ride in the van as passengers.

Specifically, Clark argues that the deposition testimony established, and Penn knew or should have known, that persons such as supervisors, driver-trainees and others would and did ride as authorized passengers in the vans it designed, and that without a seat and/or handbar for support and balance, a passenger could be injured, particularly in the event of unexpected movement or stopping of the van. He maintains that the foreseeability of injuries was increased by (a) the grooved construction of the floor and the presence of a sliding-door track behind the passenger area, which could cause an unsteady passenger to lose his footing or trip; (b) the absence of anything behind the passenger area to rest or brace against so as to avoid falling backward into the open cargo area; and (c) the absence of any warnings against the presence of passengers in a vehicle with a passenger area.

It is well settled that to recover in a strict product liability action, a plaintiff must plead and prove that the injury resulted from a condition of the product; that the condition was an unreasonably dangerous one; and that the condition existed at the time the product left the manufacturer's control. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368; *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.) Illinois courts have stated that a defective product is unreasonably dangerous when, in its manufactured state, the product fails to perform in the manner reasonably to be expected in light of its nature and intended function. *Hunt v. Blasius*, 74 Ill. 2d 203, 384 N.E.2d 368; *Dunham v. Vaughan & Bushnell Manufacturing Co.*, 42 Ill. 2d 339, 247 N.E.2d 401; *Kokoyachuk*

*v. Aeroquip Corp.* (1988), 172 Ill. App. 3d 432, 526 N.E.2d 607.

■■ Although foreseeability of danger is a factor, foreseeability alone does not give rise to a manufacturer's duty in the law of products liability. A manufacturer is not under a duty to design a product which is totally incapable of injuring anyone who foreseeably comes into contact with it; nor does products liability law make a manufacturer the insurer of all foreseeable accidents involving its products. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) A legal inference of defectiveness cannot be drawn merely from the occurrence of an injury. (*Miller v. Dvornik* (1986), 149 Ill. App. 3d 883, 501 N.E.2d 160; *Kokoyachuk v. Aeroquip Corp.* (1988), 172 Ill. App. 3d 432, 526 N.E.2d 607.) The plaintiff must establish that the injuries derive from a distinct defect which subjects persons who use or are exposed to the product to an unreasonable risk of harm, *i.e.*, dangerousness to an extent beyond that which would be contemplated by the ordinary person with ordinary knowledge common to the community relative to the product's characteristics (*Hunt v. Blasius*, 74 Ill. 2d 203, 384 N.E.2d 368; *Miller v. Dvornik*, 149 Ill. App. 3d 883, 501 N.E.2d 160). Injuries are not compensable where they derive from those inherent propensities of a product which are open and obvious to all who come into contact with the product. *Hunt v. Blasius*, 74 Ill. 2d 203, 384 N.E.2d 368.

■■ As to warnings, the general rule is that a duty to warn arises where there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm might occur absent a warning. Since the purpose of a warning is to apprise persons coming into contact with the product of dangers of which he is unaware so as to enable him to take appropriate precautions to protect himself, it logically follows that warnings serve no purpose and, hence, are not required where the dangers are open and obvious. *Kokoyachuk v. Aeroquip Corp.* (1988), 172 Ill. App. 3d 432, 526 N.E.2d 607; *Miller v. Dvornik* (1986), 149 Ill. App. 3d 883, 501 N.E.2d 160.

Although there was some conflicting deposition testimony, Penn does not dispute on appeal that it designed and manufactured the van without either a passenger seat or handbar, or that Clark's injuries were related to those conditions. Conversely, Clark does not allege that his injuries resulted from a malfunction of the van or that the van was not operating properly at the time of the occurrence. There being no serious disagreement on these points, the remaining inquiry is whether the van, in its manufactured state, was defective and unreasonably dangerous by reason of the absence of passenger seating

or some type of handgrip.

Penn asserts, as it did in its motion for summary judgment, that the van was not unreasonably dangerous because it performed in the manner reasonably to be expected in light of its nature and intended function, which was to transport only one person, i.e., the driver. Penn also argues that the lack of a passenger seat and the absence of a handgrip are inherent propensities of step-down delivery vans and that these conditions are open and obvious to all who come into contact with the vehicles.

Clark acknowledges that the absence of a passenger seat in the subject van was "self-evident." It is his position, however, that the inquiry should not be simply whether a person entering the van would recognize that there was no passenger seat, but also whether that person would appreciate the danger posed by that condition. Clark additionally argues that in contrast to seating, or the lack of it, the absence of a handgrip is not an open and obvious condition, and that a person entering a vehicle not only has no legal obligation to conduct a safety inspection but also no reason to look for safety devices—at least not until one is needed, by which time an appreciation of the danger posed by its absence is too late. He maintains that whether the absence of a seat and/or a handbar created an unreasonable risk of harm to persons, like himself, who would foreseeably ride as passengers in the van were questions which should have been presented to a jury for resolution.

We consider first Clark's argument that the design of the van was such that it was foreseeable to Penn that persons would ride as passengers in it and that such a person could be injured because of the absence of seating or a handgrip. Under the principles enunciated earlier, foreseeability is only one factor in determinations of liability based on the design and manufacture of a product. Penn's liability depends upon whether the van in its manufactured state was unreasonably dangerous because it failed to perform in the manner reasonably to be expected in light of its nature and intended function. Under this standard, injuries resulting from inherent propensities of the van which were open and obvious to all who came into contact with it are not compensable.

The consistent and undisputed deposition testimony was that the van was a standard, commercial van of the design used by most industrial laundry services and was virtually identical to the other 35 to 45 vans owned and used by Roscoe. The vehicle was equipped with three doors: a standard door on the driver's side, which was bolted closed by Roscoe personnel, a door at the rear, and a sliding door

which ran along the right passenger side of the vehicle. The van was designed and intended to be used primarily for pickups and deliveries by a single, driver/delivery person. The existence of the sliding door permitted the driver to enter and exit the van with laundry pickups or deliveries from the side rather than the rear, and the absence of a passenger seat in the front compartment facilitated the driver's ingress and egress through that side door.

Regarding the inside arrangement, Clark testified that he had ridden in identically designed vans belonging to Roscoe as well as to industrial laundries in several other cities on numerous previous occasions. Clark stated at his deposition that "there is virtually no place to sit in *these vans*. Being *designed for just a driver and material,* \*\*\* *there's nothing there for a second person,* there's no place to sit unless you want to sit on the floor." (Emphasis added.) He also testified that even when provided with a folding chair or stool to sit on, he was unstable while riding. Clark also stated that "there's nothing to hold onto \*\*\*. The only thing you can hold onto would be the door handle itself. \*\*\* As far as any type of handrail, \*\*\* there is not [*sic*]."

■ On the basis of the record before us, it is clear that the nature and intended function of the van was that of a delivery vehicle for use by one person and that the absence of a seat and handrail was an open and obvious condition of which Clark was personally and specifically aware. Thus, the van does not come within the products liability law definition of being unreasonably dangerous.

Moreover, the record establishes that whatever dangers were posed by the absence of a seat and handgrip did not rise to the level of an "unreasonable risk of harm" under the legal definition of that concept. The following colloquy occurred during Clark's deposition:

"Q. Did you appreciate the risk of a possible sudden stop while you were riding in the van in a sitting position the first time you were in town, the first five-day period you were in town? Did you appreciate the risk of a sudden stop?
A. Yes.
Q. You did appreciate the risk?
A. Sure.
Q. And you appreciated the risk when you were standing up in the van on the date of the accident?
A. Yes."

The question is normally whether the risk of harm was beyond that which would be contemplated by an ordinary person with ordinary knowledge with respect to the product's characteristics. In this case,

8

Clark expressly acknowledged his personal understanding of the risk of riding in a van which he knew from his own observation and experience did not have a passenger seat or handrail, and which he described as being designed for "just a driver and material."

Finally, inasmuch as the lack of a passenger seat and/or a handhold did not constitute an unreasonably dangerous condition or subject Clark to an unreasonable risk of harm, it logically follows that no warning of their absence was required.

For the reasons stated, we find that the trial court correctly ruled that Penn was entitled to summary judgment as a matter of law.

The order of the trial court is, therefore, affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.