NATIONAL BANK OF BLOOMINGTON, Guardian of the Estate of Tiffany Wallace, a Minor, *et al.*, Plaintiffs-Appellants, v. WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.

Fourth District   No. 4—92—0210

Opinion filed September 30, 1992.

Jerome Mirza & Associates, Ltd., of Bloomington (David V. Dorris and Thomas M. Harris, of counsel), and Culbertson, Culbertson & Allen, of Delavan, for appellants.

Karen L. Kendall and Brad A. Elward, both of Heyl, Royster, Voelker & Allen, of Peoria, and Adrian E. Harless, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

On January 30, 1983, 14-month-old Tiffany Wallace was severely burned on her lower legs when she, left unattended, crawled into the bathroom sink of her home and turned on the hot water. On April 17, 1984, the National Bank of Bloomington, as guardian of the estate of Tiffany Wallace, and Jerry Wallace, Tiffany's father, filed a two-count complaint against defendant Westinghouse Electric Corporation for negligence arising out of the manufacture and design of the water heater installed in the Wallace home. In November 1991, Westinghouse moved for summary judgment, which was granted by the circuit court on February 3, 1992. Plaintiff now appeals that decision and we affirm.

The thermostat on the electric water heater in the Wallace home was preset at 150 degrees Fahrenheit by the manufacturer and did not have an external knob or dial to change that temperature. Tiffany's mother, Christine, stated she had never experienced anything unusual with the hot water system in the house other than that the water was hot, but she did not believe that it was unusually hot. She had

never burned herself on the water. Christine admitted she would never use the hot water without turning on the cold water to reduce the temperature of the hot water. Prior to this accident, Christine had never attempted to lower the water heater temperature because she did not realize the hot water produced from the water heater could cause severe burns.

On the evening of the accident, Tiffany had been given her bath and was dressed for bed. Her mother sent her upstairs to go to bed while the older two daughters came downstairs to give their parents a good-night kiss. Christine stated the older two girls had been downstairs for about a minute when they all heard Tiffany crying. They ran upstairs and found Tiffany in the bathroom sink. Christine indicated she believed Tiffany had climbed onto the toilet stool, then onto the clothes hamper and into the sink. Tiffany was sitting in the right-hand corner of the sink facing away from the faucets as if she were trying to get back out of the sink. Only the hot water was running. Christine estimated it had been approximately 5 to 10 minutes between when she had last seen Tiffany and when she heard her crying.

Christine carried Tiffany into her bedroom in order to get dry pajamas. When she pulled off the bottom part of Tiffany's pajamas, part of her skin came away with the pajamas and that was when she realized Tiffany was seriously hurt. Christine took Tiffany to the trauma center at Burnham Hospital and the emergency room doctor stated Tiffany would have to be transported to Springfield Memorial Hospital. Tiffany was in the hospital for about three weeks and she had skin grafts on her legs.

Jerry Wallace, Tiffany's father, had never noticed anything unusual about the hot water system and he always tempered the hot water with cold water. He understood that if you turned the hot water on and left it on you could be burned. Jerry indicated that prior to Tiffany's accident, he had no knowledge as to the temperature of the hot water nor did he have any reason to determine what the temperature was or adjust the temperature. Jerry stated he, to the best of his knowledge, did not know of anyone who had altered the hot water temperature prior to his living there and he did not consider the hot water to be unusually hot nor did he ever receive any burns by the hot water. Jerry stated that approximately two weeks after Tiffany's accident, he measured the temperature of the hot water using a regular thermometer, a candy thermometer and a meat thermometer. He indicated the temperature reading at that time was 170 degrees Fahrenheit.

Gary Hutter, defendant's expert witness, reviewed various materials describing different types of water heaters, information on burns and scalds, and all the discovery material in this case. Hutter indicated he had formed three opinions as to the issues in this matter based on these materials. First, he opined that looking at the codes, standards, and industry custom and practice, it was normal to have water heaters that could produce water at temperatures such that prolonged exposure could cause injury. He believed it would be safe to have a water heater that produced water heated to 150 or 160 degrees. Hutter stated there would be reasons, such as clothes washing, dishwashing, and specifically, the washing of diapers, where it would be necessary to have hot water heated to a temperature greater than 130 degrees. He indicated that many manufacturers of washing machines and dishwashing equipment recommended temperature settings well above 130 degrees.

Next, Hutter concluded that at the time this water heater was designed and manufactured, there were no requirements or suggestions by any recognized authority that this water heater should contain warnings about scalds or burns to children who were left unattended. Hutter found that when this water heater was manufactured, water heater temperatures had the ability to be adjusted by the removal of an access panel thereby exposing an internal device, usually operated by the turning of a screw, to increase or decrease the water temperature. He stated this was acceptable by the codes and standards at that time and did not appear to be unreasonably dangerous. Hutter examined the owner's manual for this particular water heater and indicated that it specifically stated the thermostat on the hot water tank was set at 150 degrees. It appeared to him that Westinghouse recommended a service representative change the temperature but it did not specifically preclude the owners from doing it themselves.

Finally, he stated it would be foreseeable that a water heater would generate water at temperatures of 165 or 170 degrees even when it was set at 150 degrees. He explained that most water heaters, under certain conditions, will produce water that is at a higher temperature than what is preset. He further explained most water heaters are equipped with an over-temperature over-pressure device which will cause the water heater to switch off when the water temperature gets too high. He read from a sentence in the owner's manual which stated, "This Westinghouse electric water heater is equipped with an over-temperature protection. This means that if for any reason the water temperature rises above a safe limit, the electric power will automatically be shut off to the water heater and will stay

off until the fault is corrected and the reset button on the water heater is pressed to start it operating." However, he admitted there was no definition of what temperature would be unsafe. He estimated, however, this temperature would be around 190 to 200 degrees.

Thomas Knott, plaintiff's expert, consulted various standards for both gas and electric water heaters that were promulgated at the time this particular water heater was manufactured. In 1971, the standards indicated there was no recommended temperature at which a thermostat should be set. However, the electric water heater standards indicated water should not attain 185 degrees and should have a dial setting of no more than 170 degrees. Knott testified the water heater in this case met the requirements of the standards promulgated in 1971.

He opined that there was a problem with this water heater in that the temperature was preset too high and could not easily be changed. He believed water temperatures should be set at cold when at the factory, thus allowing the consumer to set the temperature upon purchase and installation. He believed that 150 degrees was too high but that 130 degrees would be an appropriate temperature at which the water heater could be preset. He based this opinion on information he had read after becoming involved in this case.

Knott was unaware of the properties of dishwashing and clothes washing detergents in 1971 and did not know what the minimum temperature would be that would be necessary to dissolve those detergents. However, he indicated that would be an important factor in trying to determine what a reasonable setting on a water heater would be. He agreed that, with respect to the use for dishwashing and clothes washing, a consumer would want to achieve a temperature that would actually dissolve the detergents and put them to their intended use. He also agreed that water heated to 130 degrees could cause a child to receive a third-degree burn and that there were temperature regulating devices that would provide water at a lower temperature coming from various faucets.

Finally, Knott testified that with this water heater, an access panel could be removed and a screw driver could be used to decrease or increase the temperature. It was his belief that this would be a cumbersome burden upon the homeowner and that the owner's manual required a serviceman to come to the home. He indicated he believed there should have been an external knob so that the user could adjust the temperature of the water heater although there were no standards promulgated in 1971 that required such a knob. He also indicated there were no standards in existence in 1971 that required a

water heater manufacturer to place a warning on the water heater that hot water could cause burns. Finally, Knott testified he did not believe there was any malfunction in this particular water heater.

Plaintiff's second expert witness, Gary Darby, inspected the Wallaces' water heater in May 1986 and found the insulation and the thermostat were intact. He indicated that the thermostat had a maximum temperature setting of 170 degrees Fahrenheit and a minimum temperature of 110 degrees. The thermostat was set at 155 degrees. He also concluded the heating elements were intact and there were no lime deposits or calcification on the tank itself. He concluded that, in his opinion, there was no defect in the manufacture of this particular water heater. He also found no tangible evidence of a malfunction of the water heater.

Darby did not consult any regulations or standards and did not consult any manufacturer's information except for the information contained on the "cut sheet" of the water heater in question. He did, however, consult with a manufacturing representative of a manufacturer other than Westinghouse. Darby stated that in 1971, temperature settings on water heaters had a range of 120 to 160 degrees with that varying five degrees either way. He indicated that most water heaters manufactured at that time had dial thermostats to change the temperature setting. He indicated this particular water heater had a temperature control setting which could be accessed by merely taking off the access panel and turning the screw with a screwdriver. He stated it was not unusual to not have an outside thermostat adjustment.

Darby indicated 150 degrees was a higher temperature than what he would consider safe for residential handwashing and bathing. However, he indicated this would be an appropriate temperature setting for residential dishwashing and clothes washing. He indicated he was unaware of the quality of detergent in 1971 and at what temperature it would be necessary for hot water to be used at to make those detergents effective. He indicated 150 degrees would be ideal for dishwashers and would be recommended for such use. He believed it would be reasonable for the manufacturer to anticipate use of the hot water heater for multiple purposes. Finally, Darby testified it was reasonable for Westinghouse to anticipate and expect that a person would not use hot water unless it was tempered by cold water. He also indicated he believed Westinghouse should have warned its consumers of the possible burning or scalding by hot water but was unaware of whether any standards promulgated in 1971 required such a warning.

In the complaint, plaintiffs alleged Westinghouse was negligent in three respects: (1) for presetting its water heater temperature at 150 degrees Fahrenheit when it knew or should have known this temperature level was dangerous to users, including the plaintiffs' ward; (2) for failing to warn its product users that a 150-degree temperature setting could produce severe burns or scald upon minimal exposure when it knew or should have known of that danger; and (3) for failing to incorporate a device within its water heater by which users themselves could decrease the water temperature level. Westinghouse filed its motion for summary judgment on November 15, 1991, alleging that it had no duty to set the water temperature thermostat at less than 150 degrees, no duty to warn product users that a 150-degree setting could produce severe burns or scalds upon minimal exposure, and no duty to incorporate a device within its water heater by which users themselves could decrease the water temperature level.

On February 3, 1992, the trial court issued its letter opinion indicating it was granting defendant's motion for summary judgment. The trial court indicated, first, the 150-degree setting of the thermostat was, as a matter of law, not negligent. The court further concluded defendant had no duty to warn that a 150-degree temperature could cause burns since the risk of being burned by hot water was an open and obvious one and that the failure to provide an external device to decrease the temperature setting was not negligent. The court found it was not objectively reasonably foreseeable that Tiffany would come into contact with the hot water as she did and become burned in the manner she did so as to impose liability upon defendant for distributing a product that met all applicable standards of the time. Accordingly, summary judgment was granted for defendant. Plaintiffs timely filed a notice of appeal.

Plaintiffs assert that the trial court went beyond the scope of the motion for summary judgment, which only raised the issue of duty, and found as a matter of law there was no negligence. Summary judgment is properly granted only when pleadings, depositions, and admissions on file, together with affidavits, if any, show there is no genuine issue of material fact and movant is entitled to judgment as a matter of law. (*Olaf v. Christie Clinic Association* (1990), 200 Ill. App. 3d 191, 193-94, 558 N.E.2d 610, 612.) In reviewing a trial court's ruling on a motion for summary judgment, the appellate court should consider anew the facts and law related to the case and determine whether the trial court was correct. (*Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 824, 585 N.E.2d 1164, 1167.) A reviewing court may sustain the decision of the trial court on any grounds called

for by the record, regardless of whether the trial court made its decision on a proper ground. (*Muck v. Van Bibber* (1992), 223 Ill. App. 3d 830, 835, 585 N.E.2d 1147, 1151.) Accordingly, we will not consider whether the trial court exceeded the limits of the motion for summary judgment, but rather will consider the facts and law related to this case and determine whether defendant was properly granted summary judgment.

Plaintiffs first contend that Westinghouse was negligent in presetting its water heater temperature at 150 degrees. Plaintiffs suggest it was foreseeable that a small child would come into contact with hot water and, because of the preset temperature, receive severe burns.

■ The essential elements of a cause of action based on common law negligence may be stated briefly as follows: the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226.) The determination of whether a duty exists—whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is an issue of law to be determined by the court. (*Wimmer v. Koenigseder* (1985), 108 Ill. 2d 435, 440, 484 N.E.2d 1088, 1091.) The existence of a legal duty is not to be bottomed on the fact of foreseeability alone, but on whether the harm was reasonably foreseeable. (*Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375, 308 N.E.2d 617, 618.) Factors which are relevant to existence of a legal duty are the reasonable foreseeability of an injury, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden upon the defendant. *Ward*, 136 Ill. 2d at 140-41, 554 N.E.2d at 226-27.

In *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1, the supreme court stated that a foreseeability test was not intended to bring within the scope of the defendant's liability every injury that might possibly occur. Rather, "Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur." (Emphasis in original.) (*Winnett*, 57 Ill. 2d at 12-13, 310 N.E.2d at 5.) The court concluded it was not objectively reasonably foreseeable that a four-year-old child would be permitted to approach an operating farm forage wagon and place her fingers in the holes in its moving screen. "While in retrospect it can be asserted that the manufacturer of the forage wagon should have foreseen that the unfortunate event in this case might conceivably occur, we do not be-

lieve its occurrence was objectively reasonable to expect." *Winnett,* 57 Ill. 2d at 13, 310 N.E.2d at 5.

In *Schierer v. Ameritex Division, United Merchants & Manufacturers, Inc.* (1980), 81 Ill. App. 3d 90, 400 N.E.2d 1072, a three-year-old child was burned when the nightgown she was wearing burst into flames after she climbed on top of the stove in the kitchen of her family's home. The child's mother sued on a strict liability theory. In affirming the granting of summary judgment, the appellate court noted it was obvious that the intended use of the stove did not embrace use by a three-year-old child. The court believed it was not objectively reasonably foreseeable for a manufacturer to expect that a three-year-old child would climb on a chair and then onto the stove wearing a very flammable nightgown. The court concluded that "[w]hile in retrospect it can be argued that the unfortunate event in this case could conceivably occur, it can be argued that almost any occurrence is conceivable" and "[t]o impose liability on such grounds would transform manufacturers and sellers into insurers of their products," a position the supreme court had previously rejected. (*Schierer,* 81 Ill. App. 3d at 94, 400 N.E.2d at 1076.) Thus, since the accident did not occur with the stove's intended use and it was not objectively reasonably foreseeable that the injury would occur in this manner, summary judgment was properly granted.

In *Gengler v. Herrington* (1991), 219 Ill. App. 3d 6, 579 N.E.2d 412, a child was burned by hot water from the bathroom sink in her baby-sitter's apartment. The child's mother sued the landlord of the baby-sitter's apartment building in a negligence action and the trial court granted summary judgment in favor of defendant. On appeal, the court held summary judgment was properly granted in favor of defendant since defendant breached no duty to the plaintiff.

The court noted defendant had no knowledge that the water in the tenant's apartment could get so hot as to cause injury to an unsuspecting child. There was no evidence that the water heater was defective, and if it was, that defendant knew of the defect and did not correct it. The court concluded:

> "Virtually every household appliance or fixture may present a danger to a two- or three-year-old child who is left unsupervised by his parents or caretaker, and in such cases, under proper circumstances, a landowner may be relieved of the duty to warn the child or remove the dangerous instrumentality whose danger is apparent. [Citation.] Under the conditions present here, the law should not impose a duty on the landlord to insure the safety of a toddler who is left free to roam and

give vent to his curiosity." (Emphasis omitted.) *Gengler*, 219 Ill. App. 3d at 13, 579 N.E.2d at 417.

In the present case, it was not objectively reasonably foreseeable that Tiffany would be injured in this manner. First, Tiffany did not use the water heater as intended. The bathroom sink had separate controls for hot and cold water and it is reasonable to assume that a person using the sink would use both hot and cold water to wash his or her hands. Both of Tiffany's parents stated they always tempered the hot water with cold water.

Furthermore, the other factors courts use to determine whether a duty exists also weigh in favor of concluding no such duty exists. The likelihood of this injury is minimal when the hot water is used properly. Again, it is reasonable to assume a person will not use the hot water untempered by cold water or would remove the body part from water that was too hot. The magnitude of the burden on defendant having to guard against this injury is great. The evidence established that at the time the water heater was manufactured, the quality of laundry and dish detergent was such that a water temperature of 150 degrees Fahrenheit was needed to kill bacteria and germs in clothes washing and dishwashing machines. Requiring defendant to lower the preset temperature to a level where no danger to small children could occur would render those products useless.

Thus, we hold there was no duty on Westinghouse to preset its temperature on the water heater at something lower than 150 degrees. It was not objectively reasonably foreseeable that a child would crawl into the sink and misuse the product in this manner. The evidence of all the experts indicated that this was the normal temperature setting for the time during which the water heater was manufactured. Since the water heater had multiple uses, and such a temperature setting was necessary in terms of proper use of the detergents for dishwashers and washing machines, no duty to lower the preset temperature existed.

Next, plaintiff alleges Westinghouse had a duty to warn its product users that a 150-degree temperature could produce scalds or severe burns with minimal exposure. Westinghouse responds it had no duty to warn since the possibility of injury from hot water resulted from a common propensity of hot water that was open and obvious.

The determination of whether a duty to warn exists is a question of law and not of fact. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465, 471.) Generally, a duty to warn arises when there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or

should know that harm might occur absent a warning. Since the purpose of the warning is to apprise persons coming into contact with the product of dangers of which he is unaware so as to enable him to take appropriate precautions to protect himself, it logically follows that warnings serve no purpose and, hence, are not required when the dangers are open and obvious. (*Clark v. Penn Versatile Van* (1990), 197 Ill. App. 3d 1, 5, 554 N.E.2d 643, 646.) There is no duty to warn of the potential of injury resulting from common propensities of products which are open and obvious. *Mealey v. Pittman* (1990), 202 Ill. App. 3d 771, 778, 559 N.E.2d 1173, 1177.

In *Genaust*, plaintiff was injured when an electric current arced from an uninsulated power line to the metal antenna he was installing. Plaintiff alleged on appeal that defendants had a duty to warn about the danger of electrical arcing of metal objects which were brought within close proximity of the uninsulated transmission wire. The court noted that the danger of electricity is common knowledge and it is also common knowledge that the metal will conduct electricity. Thus, it was not objectively reasonable to expect that a person, knowing the danger of electricity if metal should contact electrical wires, would attempt to install a metal tower and antenna in such close proximity to electrical wires. *Genaust*, 62 Ill. 2d at 466, 343 N.E.2d at 471.

In *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 502 N.E.2d 846, the court held there was no duty to warn that a lighted candle could cause injury. A four-year-old child was burned when, while visiting at defendants' home, her clothes caught on fire after she had climbed onto a bathroom counter shelf and came into contact with a lighted and unprotected candle. The court affirmed the granting of summary judgment for defendants, finding that fire is a danger which under ordinary circumstances may reasonably be expected to be fully understood and appreciated by a child of an age to be allowed at large. Since the danger was obvious and the evidence established the child knew that fire was dangerous, could burn her, and that it was on top of the candle, there was no duty to warn. *Sampson*, 151 Ill. App. 3d at 401, 502 N.E.2d at 849.

Finally, in *Young v. Chicago Housing Authority* (1987), 162 Ill. App. 3d 53, 515 N.E.2d 779, the court held defendant owed no duty to plaintiff, a five-year-old child who fell off a set of monkey bars onto concrete and sustained injuries. The court stated that a five-year-old child could appreciate the risk that falling from a height onto concrete could cause injury. See also *Alop v. Edgewood Valley Community Association* (1987), 154 Ill. App. 3d 482, 507 N.E.2d 19 (where the court

held a six-year-old child could appreciate the risk of dangers involved in falling off a slide onto an asphalt surface).

In the present case, it cannot be said that Westinghouse had a duty to warn that hot water could cause injury. Plaintiff raises the issue in terms of warning the user that water heated to 150 degrees could produce severe scalds or burns. Plaintiff then suggests that it is not open and obvious that water heated to this temperature could produce such injury. It might not be common knowledge that water at that temperature could burn the skin in one-quarter of a second, but it is within common knowledge that hot water, at any temperature for any length of time, can scald or burn skin. Thus, Westinghouse had no duty to warn that the water produced from its water heater could cause burns or scalds if used improperly. The fact that hot water within a range of temperatures can scald or burn skin is open and obvious.

Plaintiff finally contends Westinghouse was negligent in not providing an external knob or control device to adjust the temperature setting. Westinghouse alleges it owed no duty to plaintiff to design and produce a water heater that had an external temperature control device.

The duty to manufacture a reasonably safe product does not require the safest design possible or one incapable of causing injury. (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 166, 390 N.E.2d 859, 865; *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372.) In both strict liability and negligence actions, the threshold question as to an unreasonably dangerous design is not whether the product could have been made safer, but whether it is dangerous because it fails to perform in the manner reasonably to be expected in light of its nature and intended function. (*Baltus v. Weaver Division of Kidde & Co.* (1990), 199 Ill. App. 3d 821, 830, 557 N.E.2d 580, 586.) The manufacturer has the duty of due care to design and manufacture a product that will be reasonably safe for its intended and any reasonably foreseeable uses. Not only must plaintiff prove that the product was not reasonably safe, but also that the defendant knew or, in the exercise of ordinary care, should have known that the product was not reasonably safe. In a negligence action, the defendant may rebut plaintiff's proof by showing its exercise of reasonable care through evidence of its testing and inspection procedures or evidence that it complied with industry custom and practice. *Cornstubble v. Ford Motor Co.* (1988), 178 Ill. App. 3d 20, 24-25, 532 N.E.2d 884, 886.

Plaintiff has failed to show the product designed by Westinghouse was not reasonably safe or had an unreasonably dangerous de-

sign. First, the experts indicated that the temperature could have been reduced by merely removing the access panel on the water heater and turning the screw with a screwdriver. The owner's manual indicated a service representative *should* be called to lower the temperature, but did not specifically preclude the homeowners from doing such. Second, it is reasonable for the manufacturer to assume that if a consumer did not lower the temperature, the hot water would be tempered with cold water, thus minimizing any dangers from burns or scalds. The evidence indicated there were no industry standards that required an external knob to adjust the temperature. Finally, one of plaintiff's experts testified it was not unusual to find such a water heater manufactured in 1971 that did not contain an external knob. Hence, Westinghouse was not negligent in manufacturing this water heater without an external knob to regulate the water temperature.

For the foregoing reasons, we conclude the trial court properly granted summary judgment in favor of Westinghouse since it owed no duty to preset the water heater at a lower temperature or warn about the danger of injury from the hot water, nor was it negligent in manufacturing a water heater without an external knob to control the water temperature.

Affirmed.

GREEN, P.J., and STEIGMANN, J., concur.