**Lynn ARMENTROUT and Tina Armentrout, Petitioners,**

v.

**FMC CORPORATION, a Delaware corporation, Respondent.**

**No. 91SC312.**

Supreme Court of Colorado, En Banc.

Nov. 23, 1992.

As Modified on Denial of Rehearing Dec. 14, 1992.

**178**

Carolyn L. Sampson, Stewart B. Grant, Sampson & Associates, P.C., Golden, for petitioners.

Laura D. Stith, Walter L. Cofer, W. Edward Reeves, Shook, Hardy & Bacon, Kansas City, Mo., and Alfred T. McDonnell, Arnold & Porter, Denver, for amicus curiae The Product Liability Advisory Council, Inc.

Hugh Q. Gottschalk, Kristen L. Mix, Terence M. Ridley, Elizabeth Savage, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, for respondent.

James L. Gilbert, Stuart A. Ollanik, James L. Gilbert & Associates, P.C., Arvada, and Susanna Meissner–Cutler, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Justice MULLARKEY delivered the Opinion of the Court.

This case arises from an accident in which Lynn Armentrout was crushed between a stationary truck base and the rotating superstructure of a crane manufactured by FMC Corporation (FMC). Armentrout incurred severe injuries as a result of the accident and, with his wife, Tina Armentrout, filed an action against FMC seeking damages on theories of strict liability for failure to warn, strict liability for defective design, negligence in warning, and negligence in design. The jury returned a verdict in favor of FMC, and the trial court entered judgment accordingly.

The court of appeals reversed the judgment and remanded for retrial on two separate grounds not discussed in this opinion. *Armentrout v. FMC Corporation*, 819 P.2d 522 (Colo.App.1991). In addition, the court of appeals addressed four other issues which will occur on retrial. We denied FMC's petition for certiorari and left standing the court of appeals' judgment ordering a new trial. We granted certiorari to consider the four issues challenged by the Armentrouts in their cross-petition. We reverse in part, affirm in part and remand for further proceedings consistent with this opinion.

I.

Armentrout was injured when he was struck by the rotating upper of a crane manufactured by FMC. The accident occurred while he was working as a crane oiler for Derr–Gruenewald Construction Company, which owned and operated the crane. Armentrout's job was to monitor and maintain the fluid levels of the crane and to keep the surfaces of the crane clean. When Armentrout was struck by the rotating upper, he was cleaning the deck of the crane's stationary base. The facts indicate that he was standing either in the area known as the "forward luggage carrier"[1] or on the deck of the stationary base. When the superstructure of the crane moved, Armentrout was trapped in the area known as the "pinch point," where the space between the superstructure and the base of the crane is closed off during the rotation of the superstructure. He was not aware that the superstructure of the crane was moving until it struck him.

Thereafter, Lynn Armentrout and his wife Tina Armentrout filed an action against FMC asserting claims of strict liability for failure to warn, strict liability for design defect, negligent failure to warn and negligent design defect. The Armentrouts requested relief under the theory that the existence of the crane's "pinch point" was a hazard which FMC should have

---

1. The forward luggage carrier is a storage compartment located to the side of the deck behind the front wheels of the stationary base.

warned against or removed by altering the design of the crane.

There was no bell or other audible warning to give notice that the superstructure was moving.[2] No warnings were posted on the crane itself which would advise persons working on the crane to stay out of the crane area while it was moving.[3] However, an FMC manual supplied with the crane at the time of sale provided the following warning: "Keep clear of rotating upper or moving parts. Pinch points which result from relative motion between moving parts can cause injury."

Although the cleaning and maintenance of the crane may be done while the superstructure was not in motion,[4] testimony at trial established that it was routine practice among the oilers to work on the crane while it was being operated. The trial court allowed the Armentrouts to introduce evidence, for the limited purpose of showing notice to FMC of the crane's hazard, that FMC possessed numerous accident reports involving incidents in which workers were injured in the "pinch point" of the crane.

FMC's defense was based on the argument that Armentrout's injuries were caused by his own misuse and the negligence of the crane operator, rather than by a defect in the crane. FMC presented evidence showing that the accident was a result of the continuing unsafe work habits of the crane operator and Armentrout. The jury returned a verdict in favor of FMC.

The Armentrouts appealed to the court of appeals. The court of appeals reversed the judgment and remanded the case for retrial. FMC filed a petition for writ of certiorari with this court and the Armentrouts cross-petitioned for writ of certiorari. We granted certiorari to consider the issues presented in the Armentrouts' cross-petition.

## II.

The first issue involves the Armentrouts' claim of strict liability for failure to warn. We granted certiorari to consider whether the open and obvious nature of a risk is a defense to a strict liability failure-to-warn claim. Although the obviousness of the risk is not necessarily a complete defense to such a claim, we affirm the court of appeals' ruling on the facts.

The Armentrouts argued that FMC's crane was defective for lack of adequate warning because there was no warning decal on the machine to remind the user of the possibility of injury if the superstructure were in motion.[5] The oilers testified that the presence of a warning label on the crane would have reminded them of the danger. Furthermore, the evidence indicates that prior to Armentrout's accident, FMC had begun installing a warning decal on new cranes depicting a human figure being crushed in the same manner as Armentrout, and stating "!DANGER—Keep clear of swinging upper to prevent serious bodily injury."

There was also evidence that FMC gave warnings of the crane's pinch points in the

2. Oilers who worked within the swing radius of the superstructure stated that they are aware of the movement of the crane through a change in the sound of the engine, but that it is possible for the crane to move without the oiler's knowledge when the oiler's ability to hear the engine is affected by wind or gravitational pulling caused by an unevenly positioned crane.

3. Prior to Armentrout's accident, but after the crane involved in the accident was purchased, FMC began installing a decal on new cranes warning of the danger of the crane in movement.

4. However, at least one oiler testified that the safety checking which an oiler performs as part

of his job must be done while the crane is in operation.

5. We will review only the lack of a warning decal in a failure-to-warn context, although the Armentrouts have variously characterized the lack of a warning bell as either a failure-to-warn claim or a design-defect claim or both. Beginning with the pretrial hearing on FMC's motion in limine to exclude evidence regarding swing alarms on crawler cranes, the trial court treated the lack of a warning bell only as a design defect. The plaintiffs acquiesced in this characterization, since no objections were made at the time and their own treatment of the warning bell issue was inconsistent.

manuals provided with the crane. In addition, testimony at trial indicated that, although the crane operators and oilers were aware of the danger of working on the crane while it was operating, they routinely did so despite the known danger. Furthermore, Lynn Armentrout himself testified that a warning label would not have affected the way he did his job.

The trial court instructed the jury to consider this evidence in the following context:

> A product is defective and unreasonably dangerous if it is not accompanied by sufficient warnings or instructions for use. To be sufficient, such warnings or instructions for use must adequately inform the ordinary user of any specific risk of harm which may be involved in any intended or reasonably expected use.
>
> However, if a specific risk of harm would be apparent to an ordinary user from the product itself, a warning of or instructions concerning that specific risk of harm is not required.

Jury Instruction No. 27.[6] The Armentrouts assert that the second paragraph of this instruction should have been deleted from the jury instruction.

The court of appeals rejected the Armentrouts' argument on alternate grounds. First, it distinguished *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240 (Colo.1987), and held that *Camacho* did not require that the pattern jury instruction be modified as the Armentrouts requested. *Armentrout*, 819 P.2d at 525. Second, it found that the second paragraph of the instruction was consistent with the Armentrouts' theory of the case:

> Moreover, the second paragraph of this instruction is consistent with plaintiffs' position that the specific risk of harm (that of standing in the well of the "luggage carrier" where plaintiff was injured) was not apparent and allowed the jury to conclude that a warning was required, if the evidence so warranted.

*Id.* We will consider the court of appeals' holdings in reverse order.

Initially, we agree with the court of appeals that the instruction given was consistent with the Armentrouts' theory at trial and, for that reason, the second paragraph of the pattern instruction was properly included in Instruction No. 27. Whether the danger was "open and obvious" was hotly disputed at trial. The Armentrouts claimed that Lynn Armentrout was standing in or near the forward luggage carrier when he was crushed and that the danger of being trapped in the forward luggage carrier was not apparent. The court of appeals' conclusion that Instruction No. 27 was consistent with the Armentrouts' trial presentation is buttressed by the Armentrouts' treatment of their negligence claim for failure to warn. The Armentrouts stipulated to Instruction No. 20 which required the jury to find that the danger was not obvious to the final user in order to hold FMC liable. Instruction No. 20 stated:

> If a seller of a crane knows or in the exercise of reasonable care should know that the use of the crane may be harmful or injurious and such danger would not be obvious to the final user, then the seller is obligated to use reasonable care to warn the user of the danger, and he is negligent if he fails to do so. This duty to give warning is discharged if he labels his crane in a manner which would reasonably inform the user of the danger.

Based on the facts of this case, Instruction No. 27 was not improper. However, we do not agree that the court of appeals correctly interpreted *Camacho*.

In this regard, FMC argues that the court of appeals' decision in affirming the trial court's application of the open and obvious doctrine is properly based on the well-recognized distinction between failure-to-warn claims and design-defect claims in product liability cases and that the same reasons for rejecting the doctrine in design-defect cases do not apply in failure-to-warn cases. Specifically, FMC concedes that the obvious nature of the hazard is irrelevant in design-defect cases because if the prod-

---

**6.** Instruction No. 27 was taken from CJI–Civ.3d 14:20 (1989) and was offered by the defendant.

The trial court rejected the Armentrouts' proposed instruction.

uct could have been designed to be safer, it should have been so designed. On the other hand, FMC argues, the obvious nature of the danger in failure-to-warn cases is relevant to the manufacturer's duty to provide a written warning because such a warning does not improve the safety of the product.

FMC's argument is not persuasive. As the present case illustrates, failure-to-warn and design-defect claims often arise in the same context and are not sharply differentiated. The distinction which FMC suggests has not been followed in our cases. In *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978), and *Camacho*, we held that the open and obvious nature of the risk is not a complete bar to a strict liability failure-to-warn claim. *See also Anderson v. M.W. Kellogg, Co.*, 766 P.2d 637 (Colo.1988). These holdings were premised on our conclusion, contrary to FMC's assertion, that a warning may make a product safer even if the danger is open and obvious. As we stated in *Camacho*, "[t]he purpose of a warning is to ensure that an otherwise dangerous product is used in a reasonably safe manner." *Camacho*, 741 P.2d at 1248.

The Notes on Use following CJI–Civ.2d 14:20 (1989), from which Instruction No. 27 was taken, contain the following direction:

> Even though a risk may be "open and obvious," a product may nonetheless be defective for lack of an adequate warning, *e.g.* that an option is available for use with, or as part of, the product which would make it safer. *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240 n. 9 (Colo.1987), *citing Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978). In such cases, appropriate modifications may be required in the second paragraph of this instruction.

The example contained in the comment is based on the facts of *Camacho* where the plaintiff claimed that Honda's failure to warn him that optional crash bars were available rendered a motorcycle in a defective condition unreasonably dangerous. *Camacho*, 741 P.2d at 1248. We stated that "a duty to warn may exist where the

danger is patent if such warning might reduce the risk of harm attendant upon use of the product." *Id.* at n. 9. We directed the trial court to consider on remand "the efficacy of providing a warning." *Id.* at 1248.

The remand order in *Camacho* refers to the trial court's well-established obligation to determine, as a matter of law, whether the defendant had a duty to warn the plaintiff. *Taco Bell v. Lannon*, 744 P.2d 43, 46 (Colo.1987); *University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987); *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo.1986); *Restatement (Second) of Torts* § 328B (1965).

■ The open and obvious nature of a risk is not necessarily a complete defense to a strict liability failure-to-warn claim. Rather, the obviousness of the danger and the efficacy of the proposed warning are factors which the trial court should consider in determining whether the defendant had a duty to warn an ordinary user in the plaintiff's position. If the danger is open and obvious, there is no duty to warn unless there is a substantial likelihood that the proposed warning would have prevented injury to the ordinary user. If the trial court finds the existence of a duty to warn under such circumstances, then a *Camacho*-based modification of the pattern instruction is appropriate.

■ On the facts developed at the first trial, it is apparent that the warning decal does not meet the *Camacho* efficacy test. At most, the Armentrouts produced some evidence that the warning decal might have reminded some oilers of the dangers posed by the moving crane. There is no evidence that it would have prevented an injury such as that suffered by Lynn Armentrout. The trial court properly refused to modify Instruction No. 27 and we affirm the court of appeals.

### III.

■ The second issue involves the court of appeals' allocation of the burden of proof with respect to the plaintiffs' design-

defect claim in this case. In order to sustain a claim for defective design, the plaintiffs must first establish a prima facie case. Two essential elements of that prima facie case, of course, are injury and causation, and there is no dispute that the Armentrouts have proven both. Rather, the parties dispute whether the plaintiffs are also required to prove the unreasonable dangerousness of the product.[7] We hold that the plaintiffs, using the risk-benefit analysis, must carry that burden.

In the present case, the jury was instructed that:

> A product is unreasonably dangerous because of a defect in its design if it creates a risk of harm to persons which is not outweighed by the benefits to be achieved from such design.

Instruction No. 24.[8] The Armentrouts argued before the court of appeals that the trial court erred in failing to instruct the jury that FMC bore the burden of showing the benefit of the design once the Armentrouts had shown the risk of harm contained in the design. The court of appeals concluded that, because the plaintiffs bear the burden of proving that a product is unreasonably dangerous, which "necessarily encompasses the requirement that the risk outweighs the benefit," the trial court did not err in submitting Instruction No. 24 and in refusing to instruct the jury that the

defendant carried the burden of showing the benefits of the product. *Armentrout,* 819 P.2d at 526. We agree.

The instruction given by the trial court incorporates the rule that whether a product is "unreasonably dangerous" is to be determined under a risk-benefit analysis. In *Ortho Pharmaceutical Corp. v. Heath,* 722 P.2d 410 (Colo.1986), we adopted the risk-benefit test set forth in the California case of *Barker v. Lull Eng'g Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). We stated:

> [I]n design defect cases, the court may properly instruct the jury that a product is defective in design if ... the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Ortho,* 722 P.2d at 413 (*quoting Barker,* 143 Cal.Rptr. at 234, 573 P.2d at 452).

The Armentrouts rely on *Ortho* in making their argument. As discussed above, under *Ortho,* the burden of proof that the benefits outweigh the risks lies with the defendant, once the plaintiff has established causation and injury. *Ortho,* 722 P.2d at 413. This is the same allocation of the burden of proof as set forth in *Barker,* and followed in California.

---

**7.** In *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978), we declined to follow the approach of those jurisdictions which have eliminated the "unreasonably dangerous" portion of the definition of strict liability. *Id.* at 171 n. 5, 583 P.2d at 282 n. 5. The California Supreme Court, for example, rejected the "unreasonably dangerous" element on the ground that it would improperly "require an injured plaintiff to prove not only that the product contained a defect but also that such defect made the product unreasonably dangerous to the user or consumer." *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153, 1163 (1972). Taking the contrary position, we concluded that to require the plaintiff to prove that additional element "serves the useful function of placing some limits on the liability of a manufacturer or seller." *Union Supply,* 196 Colo. at 171 n. 5, 583 P.2d at 282 n. 5.

**8.** Instruction No. 24 was taken from CJI–Civ. 14:19 (1989). The Armentrouts requested that this instruction be given to the jury.

In addition, the Armentrouts submitted the following two instructions, placing the burden of proof upon the defendant, which were rejected by the trial court:

> *Instruction Y:* A product is unreasonably dangerous because of a defect in design if it creates a risk of harm to persons, unless the Defendant can prove that the benefits to be achieved from such defective design outweigh such risks.
>
> *Instruction O:* The [crane] is presumed to be defectively designed. If you, the jury, determine that the forward luggage carrier area or forward deck area is a cause of the accident, you must then find for the Plaintiff, Lynn Armentrout, unless the Defendant, FMC Corporation, produces evidence from which you can determine that the specific benefit of the design of the forward luggage carrier or deck area and warnings outweigh the inherent risk of serious and debilitating injury.

Here, the court of appeals relied on *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276, to conclude that the *Barker* distribution of the burden of proof does not apply in Colorado on the grounds that *Union Supply* requires the plaintiff in a design-defect case to prove that the product is unreasonably dangerous and that such proof necessarily encompasses the requirement that the risk outweigh the harm. *Armentrout*, 819 P.2d at 526. The Armentrouts argue that such a distinction is unpersuasive because there is no difference between what must be found by the jury to hold the defendant liable in this state, *i.e.*, unreasonable dangerousness, and what must be found in California, *i.e.*, defectiveness. They argue that the fact that a showing of "unreasonable dangerousness" is required is irrelevant to the issue of which party should bear the burden of showing the benefit of a product's design. This argument is without merit.

Although both states employ a risk-benefit test in determining whether a design is defective for purposes of liability, *see Barker*, 573 P.2d at 454, and *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240, 1246–47 (in both cases, the respective courts held exclusive reliance upon the consumer expectations test is inappropriate for determining liability for defective design), the California Supreme Court specifically has held that the plaintiff in a design-defect case is not required to prove all the elements of liability. *See Barker*, 573 P.2d

at 455 (concluding that once a plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden shifts to the defendant to prove that the benefits outweigh the risks, *i.e.*, "that the product is not defective").

In contrast, this court has chosen to follow the *Restatement (Second) of Torts* § 402A in requiring a plaintiff to prove that a product is in a "defective condition unreasonably dangerous." *Union Supply*, 196 Colo. at 171, 583 P.2d at 282 n. 5. Because the determination of whether a product is "unreasonably dangerous" is made through a risk-benefit analysis, we find that the plaintiffs also bear the burden of proving that the risks outweigh the benefits of the design.[9]

To the extent that *Ortho* holds that the burden of proving that "the product's benefits outweigh its inherent risks" rests with the manufacturer, we overrule the case. *See Ortho*, 722 P.2d at 413. We merely intended, in that case, to adopt the risk-benefit analysis set out in *Barker* for determining the defectiveness of a design. In light of our previous decision rejecting California's attempt to relieve the plaintiff of proving more than the existence of a "defect" in a product, we conclude that the burden of proof allocation set out in *Barker* is inapplicable in Colorado.

■ In order to determine whether the risks outweigh the benefits of the product design, the jury must consider different

---

**9.** In *Wilson v. Piper Aircraft Corp.*, 282 Or. 411, 579 P.2d 1287 (1978), the Supreme Court of Oregon rejected the allocation of the burden of proof set forth by the Supreme Court of California in *Barker*, 573 P.2d 443. The Oregon court reasoned:

In recent years California's law of products liability and our own have developed along different lines. We regard the *Barker* decision as additional evidence of those differences. Under that decision it appears that a design defect case will always go to the jury if only the plaintiff can show that the product caused the injury. In this jurisdiction, however, it is part of a plaintiff's case to show that a product which caused an injury was dangerously defective.

*Wilson*, 579 P.2d at 1287–88. The following test sheds some light on the meaning of "dangerously defective" in Oregon:

To impose liability there has to be something about the article which makes it dangerously defective without regard to whether the manufacturer was or was not at fault for such condition. A test for unreasonable danger is therefore vital. A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character. Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033, 1036 (1974) (emphasis in original). Although Oregon's meaning of "dangerously defective" differs from the definition of "unreasonably dangerous" in this state, we find Oregon's approach persuasive. Accordingly, we conclude that the court of appeals properly distinguished *Barker* on the ground that a prima facie showing in Colorado is one of "unreasonable dangerousness."

interests, represented by certain factors. In *Ortho,* we listed the following factors which could be considered in determining whether the risks outweigh the benefits:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury and the probable seriousness of the injury.

(3) The availability of the substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Ortho,* 722 P.2d at 414 (relying on John W. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973)). Without addressing *Ortho's* allocation of the burden of proof to the defendant to prove that the design's benefits prevail, we held in *Camacho* that it is reasonable to require a plaintiff to establish unreasonable dangerousness and we employed the factors set out in *Ortho* for performing the risk-benefit analysis. *Camacho,* 741 P.2d at 1245, 1247. Neither *Ortho* nor *Camacho* suggest that these factors are to be strictly applied in every case. This list is not exclusive, but merely illustrative of factors which may assist in determining whether or not a design is unreasonably dangerous. Depending on the circumstances of each case, flexibility is necessary to decide which factors are to be applied, and the list of factors mentioned in *Ortho* and *Camacho* may be expanded or contracted as needed.[10]

We note here that there may be some confusion as to the elements of a prima facie case for the plaintiff in other jurisdictions. Several jurisdictions apparently focus on the requirement that the

---

**10.** The authorities indicate that the relevant factors cannot be confined to a single list which always must be applied regardless of circumstances. Different commentators have suggested different sets of factors to apply in design defect cases. For example, in his article setting forth the factors we adopted in *Ortho,* Professor Wade states that the list is a revision of another list. Wade, *On the Nature of Strict Tort Liability for Products,* at 837. In addition, Professor Twerski expands upon the seven factors offered by Professor Wade, offering a list of relatively different factors to be considered:

(1) Polycentricity: Aspects of the product design may be related in such a way that any design change would substantially affect the cost, utility, safety, or esthetics of the product.

(2) Close risk-utility proof: The task of weighing and balancing the product's potential for harm against its utility may be difficult or impossible.

(3) State of the art: The alternative design may not be practically feasible in light of the state of the art.

(4) Tenuous causation: The case for causation-in-fact may be tenuous.

(5) Shifting duty: Independent and responsible decisionmakers may have played a significant role in assessing and utilizing the allegedly hazardous product.

(6) Consumer choice: Consumers may have the option to purchase a similar product without the alleged safety hazard.

(7) Obviousness of danger: The hazard may be open and obvious to the ordinary consumer.

(8) Cost: An alternative design could substantially raise the cost of the product to the consumer.

(9) Design safety review process: The safety review process that led to the formulation of the product's design may have been extensive.

(10) Legislation: The government may have played a role in regulating the product's design.

Aaron D. Twerski, *Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation,* 57 N.Y.U.L.Rev. 521, 527 (1982). The Texas Supreme Court, moreover, rejected the enumerated factors risk-utility test altogether because of the "difficulty of formulating a series of specific factors which fact finders will be instructed to balance." *Turner v. General Motors Corp.,* 584 S.W.2d 844, 849 (Tex.1979).

plaintiff establish the existence of a practicable design alternative. For example, the Supreme Court of Oregon has held that "a prima facie case of design defect must include evidence which would permit a finding that a safer design would have been practicable." *Wilson v. Piper Aircraft Corp.*, 282 Or. 411, 579 P.2d 1287 (1978); *see also Huddell v. Levin*, 537 F.2d 726 (3d Cir.1976) (New Jersey law); *Lolie v. Ohio Brass Co.*, 502 F.2d 741 (7th Cir.1974) (Illinois law). We agree that the existence of a feasible alternative is a factor in the risk-benefit analysis of the unreasonable dangerousness of the product design.[11] In the present case, the Armentrouts did present evidence of a practicable design alternative—the addition of a warning bell to the crane. On retrial, such evidence would be considered in support of the claimed unreasonable dangerousness of the product design.

We conclude that the court of appeals properly placed the burden on the plaintiffs of proving that the risks outweigh the benefits of a design. The trial court's instructions on design defect were sufficient, and we affirm the court of appeals' decision as to this issue.

### IV.

■ Next, we consider whether the trial court erred in failing to specifically instruct the jury as to the meaning of "defective" for purposes of considering the Armentrouts' claim of defective design. The relevant portion of the instruction setting forth the elements of strict liability for defective product stated:

> In order for the plaintiff, Lynn Armentrout, to recover from the defendant, FMC Corporation, on his claim of sale of a defective product, you must find all of the following have been proved by a preponderance of the evidence:
> 1. The [crane] was defective and, because of the defect, the crane was unreasonably dangerous to a person who might reasonably be expected to be affected by the crane.

Instruction No. 23.[12] Instruction No. 24,[13] also submitted to the jury, defined the term "unreasonably dangerous." The Armentrouts argue that neither of these instructions adequately informed the jury of the meaning of the term "defect" or "defective."

The Armentrouts argue that under the directions given to the jury, the jury was required first to determine that the crane was "defective" before it could conclude that the crane was unreasonably dangerous. They argue that the jury could not arrive at a finding of "unreasonable dangerousness" in this case, as it should have, because the jury was inadequately instructed as to the meaning of "defective." Without a specific definition of "defective," the Armentrouts argue that the jury presumably interpreted the word to mean "broken," its common meaning. Plaintiffs' Instruction BBB, offered by the Armentrouts, states:

> A product is defective and unreasonably dangerous because of its design if it cre-

11. We also note, however, that evidence of a feasible design alternative is not always necessary. As the Supreme Court of Oregon stated:

> [T]he court's task is to weigh the factors bearing on the utility and the magnitude of the risk and to determine whether, on balance, the case is a proper one for submission to the jury. In this case we focus on the practicability of a safer alternative design and hold that the evidence was insufficient to permit the trial judge to consider that factor. Our holding should not be interpreted as a requirement that this factor must in all cases weigh in plaintiff's favor before the case can be submitted to the jury. There might be cases in which the jury would be permitted to hold the defendant liable on account of a danger-

ous design feature even though no safer design was feasible (or there was no evidence of a safer practicable alternative).

*Wilson*, 579 P.2d at 1328 n. 5.

12. This instruction is modeled after CJI–Civ.3d 14:18.

13. Instruction No. 24 stated:

> A product is unreasonably dangerous because of a defect in its design if it creates a risk of harm to persons which is not outweighed by the benefits to be achieved from such design.

Plaintiffs' Instruction A, offered by the Armentrouts, differed from Instruction No. 24 only in that it added the word "specific" before "design."

ates a risk of harm to persons which is not outweighed by the benefits to be achieved from such design.[14]

In addition, the Armentrouts argue that under the law, "defective" is equivalent to the term "unreasonably dangerous" and that the jury should have been so instructed.

The court of appeals determined that, although it is necessary for the jury to understand the specific concept of "defective" as it applies in the context of a product liability action and the jury was not specifically instructed as to the meaning of "defective," its meaning was "amply clear" because the terms "defect" and "defective" were used often during the three-week trial. Therefore, the court of appeals concluded that the absence of a separate definition of the term "defective" in this case would not have required a retrial, but that because a retrial has been determined necessary on other issues, the jury should receive a specific instruction at retrial on the definition of the term "defective."

■ The form of the instructions given at trial is within the discretion of the trial court. *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110 (Colo.1982); *Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 63, 470 P.2d 34, 37 (1970). "All of the court's instructions to the jury are to be read and considered as a whole in determining whether all the necessary law has been correctly stated to the jury." *Montgomery Ward & Co.*, 172 Colo. at 63, 470 P.2d at 36–37. A judgment will not be reversed for refusal of the trial court to give requested instructions where there was not resulting substantial, prejudicial error. *Clark v. Giacomini*, 85 Colo. 530, 531, 277 P. 306, 307 (1929); *see also Stephens v. Koch*, 192 Colo. 531, 533, 561 P.2d 333, 334 (1977) ("the power to review does not encompass the power to reverse a jury verdict based on a legally correct instruction, although the appellate court might prefer other language").

■ Confusion as to the meaning of "defective" apparently stems from the fact that the word is used in two different ways in a design-defect claim. The word "defective" often is used to express a legal conclusion upon which liability may be based. *See* John W. Wade, *On Product "Design Defects" and their Actionability*, 33 Vand. L.Rev. 551–52 (1980). When so used, "defective" is not a test for reaching the legal conclusion but is merely an abbreviation of the term "defective condition unreasonably dangerous" as used in *Restatement (Second) of Torts* § 402A. In addition, however, "defective" also is used in design-defect cases to refer to an aspect of the product which, according to the plaintiffs, causes the product to be "unreasonably dangerous." "A 'defect' does not mean a mere mechanical or functional defect but is *anything* that makes the product 'unreasonably dangerous.'" *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 643 (Colo.1988) (emphasis added).

■ The jury in this case was not given any instruction on the meanings of "defect" or "defective," although those words were present in both of the instructions given on the claim for defective design. Under Instruction No. 23, the jury was required to determine 1) that the crane was "defective," and 2) that the "defect" caused the crane to be "unreasonably dangerous." The word "defective," or "defect," as used in Instruction No. 23 refers to the word's second definition, which we articulated above, *i.e.*, an aspect of the crane's design. Therefore, we will focus on whether the jury was adequately informed as to the meaning of "defective," as used in this context.[15]

---

**14.** FMC does not oppose giving this instruction when the case is retried on remand.

**15.** We find it unnecessary for the trial court to instruct the jury as to the meaning of "defective" as a legal conclusion upon which liability may be based. That concept is adequately expressed in Instruction No. 23, which sets out the elements of liability for "sale of a defective product." However, to avoid confusion which may result from the word's two meanings, "defective," when used as a legal conclusion, should be referred to as "defective condition unreasonably dangerous."

■ We must assume that the jury followed the court's instructions. *Lexton–Ancira Real Estate Fund v. Heller*, 826 P.2d 819, 824 (Colo.1992); *Schmutz v. Bolles*, 800 P.2d 1307, 1315 (Colo.1990). In light of the absence of any definition, we presume that the jury applied the common meaning of "defect." "Defect" means "1) an irregularity in a surface or a structure that spoils the appearance or causes weakness or failure, or 2) want or absence of something necessary for completeness." *Webster's Third New International Dictionary* 591 (1986). This common definition does not conform to the notion of "defect" set forth by this court in *Anderson*, 766 P.2d 637, and discussed above. The term "defect," in the context of a design-defect claim, means any aspect of the design, not just an irregularity or absence of completeness.

Because the crane was manufactured and performed exactly as intended, it cannot be considered to be irregular or lacking in something essential to completeness. Application of the common meaning of the word by the jury would have resulted in a finding of non-defectiveness and, thus, a failure to perform the risk-benefit analysis. However, under the *Anderson* definition of "defect," the jury in this case should have determined if *any aspect* of the design caused the product to be "unreasonably dangerous," *i.e.*, caused the risks of the design to outweigh the benefits. Therefore, we conclude that the instructions as a whole inadequately apprised the jury of the need to consider the risk-benefit test in its determination of whether the product was "defective."

■ We affirm that portion of the court of appeals' decision which holds that the jury should have been specifically instructed as to the definition of "defective." We reject that portion of the court of appeals' opinion which takes into consideration the use of the terms "defective" and "defect" throughout the trial. The test is whether the instructions, as a whole, correctly and adequately set forth the applicable law, not whether the jury could glean the term's meaning from its use during the course of the trial. *Cf. Pueblo Bank and Trust Co. v. McMartin*, 31 Colo.App. 546, 549, 506 P.2d 759, 761 (1972), *appeal after remand* 528 P.2d 953 (1974); *Murrow v. Whiteley*, 125 Colo. 392, 401, 244 P.2d 657, 662 (1952).

■ Although the law set forth in the instructions was correct, the jury was not adequately informed of the correct standard with which to determine the existence of "defectiveness," which resulted in substantial and prejudicial error. *See Lee v. Great Empire Broadcasting, Inc.*, 794 P.2d 1032 (Colo.App.1989) (trial court's rejection of instruction requiring jury to determine nature of employment relationship constituted prejudicial error as it left jury without any standards against which to judge employer's defense). Therefore, on remand the trial court should instruct the jury that a "defect" refers to any aspect, not necessarily a flaw, in the product's design which causes the product to be unreasonably dangerous.

## V.

■ Finally, we consider whether the trial court erred in giving the jury the following instruction on the defense of misuse:

A manufacturer of a product is not legally responsible for injuries caused by a product if: (1) the product is used in a manner or for a purpose other than that which was intended and which could not reasonably have been expected by the manufacturer; and (2) such use rather than a defect, if any, in the product caused the plaintiffs' claimed injuries.[16]

The court of appeals cited *Schmutz*, 800 P.2d 1307, concluding that "[b]ecause the record contains evidence that such misuse [17] may have been unforeseeable by the defendant, the court did not err in submitting the instruction to the jury." The court

---

**16.** Instruction No. 29 was based on CJI–Civ.3d 14:22 (1989).

**17.** The misuse in this case was identified by the trial court as Armentrout's presence within the swing radius of the superstructure during the operation of the crane.

of appeals added, "[h]owever, on retrial, the jurors must be instructed that unless they determine that the misuse was unforeseeable, that misuse may not be considered as a defense."

The Armentrouts argue that Instruction No. 29 was improperly given in light of *Schmutz*. They argue that our decision in *Schmutz* bars a misuse instruction in this case because, as in *Schmutz*, FMC was aware that oilers worked within the swing radius of the superstructure while the crane was in operation and that numerous similar incidents had occurred prior to Armentrout's accident.

■ This court has recognized that, regardless of the defective condition of a product, misuse by an injured party which cannot be reasonably anticipated by the manufacturer is a defense where that conduct actually caused the injury. *Schmutz*, 800 P.2d at 1316; *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1324–25 (Colo. 1986) (noting that the *Restatement (Second) of Torts* § 402A cmt. h provides for the recognition of such a defense); *Jackson v. Harsco Corp.*, 673 P.2d 363, 367 (Colo.1983). "A defendant who could reasonably foresee the possibility of misuse is not entitled to an instruction on the misuse defense." *Schmutz*, 800 P.2d at 1316 (*citing Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir.1989)). Before an instruction on the misuse defense can be given, there must be sufficient competent evidence that a defendant could not foresee the possibility of misuse. *Schmutz*, 800 P.2d at 1316; *Farrell*, 866 F.2d at 1297; *see also Converse v. Zinke*, 635 P.2d 882, 889 (Colo.1981).

In *Schmutz*, we concluded that "there was no competent evidence that the hospital's failure to clean the drill properly was unforeseeable.... Because a single instance of improper cleaning could cause the drill to malfunction and numerous instances of improper cleaning in various hospitals were known to [the defendant], the uncontroverted evidence was that the product misuse was foreseeable. There was no evidence to support the product misuse instruction." *Id.*, 800 P.2d at 1316–17. We considered evidence of prior incident reports, involving the same type of misuse involved in the accident in question, as support for the conclusion that the misuse was foreseeable.

■ FMC argues that *Schmutz* can be interpreted to mean that any time a manufacturer is aware of the misuse of its product, it is not entitled to a misuse instruction, and that such an interpretation is inconsistent with our decision in *Uptain*. We held, in *Uptain*, that the plaintiff's failure to read and heed the warnings printed on the product's label and her act of using her bare hands to wring out a swab soaked in a caustic cleaning solution called Sani–Tate were unforeseeable uses of Sani–Tate. In so holding, we quoted the following language from the *Restatement (Second) of Torts* § 402A cmt. j:

Where warning is given, the seller may reasonably assume that it will be read and heeded....

Our holding in *Schmutz* is consistent with the law set forth in *Uptain*. We merely found in *Schmutz* that there was no competent evidence to support a conclusion that the misuse was unforeseeable. A defendant's actual awareness of a particular type of misuse involved with its product, including knowledge acquired from prior incident reports, may be considered in determining that the misuse was reasonably foreseeable. If there is also substantial evidence demonstrating that the misuse was not foreseeable, or the existence of adequate warnings as in the case of *Uptain*, then an instruction on misuse would be proper. *Schmutz* involved no such warnings or evidence. Thus, the defendant was not entitled to the instruction.

FMC attempts to distinguish *Schmutz*, arguing that its provision of a warning in the manual entitles it to the presumption of unforeseeability articulated in *Uptain*. There is evidence showing that Armentrout did not receive the warnings in the manual. Such evidence places in question the adequacy of warnings provided to the *users* of the crane. In *Uptain*, adequate warning reached the users of the product through a label affixed to the container. Therefore,

*Schmutz* is not inapplicable to this case on that ground.

On the contrary, the evidence in this case, similar to that in the *Schmutz* case, supports a conclusion that it was reasonably foreseeable that the oilers would be present in the radius of the rotating upper of the crane when it was moving. The record indicates that the crane's upper/lower design made it more efficient to clean and oil the machine while the crane was operating. Testimony established that FMC was aware that oilers worked within the swing radius of the rotating upper when the crane was in operation. In addition, the evidence shows that FMC possessed numerous incident reports involving "pinch point" accidents. There is no competent evidence which would support a conclusion that the product misuse was unforeseeable. Accordingly, we hold that the court of appeals erroneously affirmed the trial court's submission of the misuse instruction to the jury.[18]

## VI.

In summary, we reach the following conclusions. First, the open and obvious nature of risk does not necessarily bar a strict liability claim for failure to warn. On the facts, the trial court properly declined to modify the pattern instruction at issue. Second, the plaintiffs, in asserting a design-defect claim, must show injury, causation, and the unreasonable dangerousness of the product according to the risk-benefit analysis. Third, the trial court inadequately informed the jury of the correct standard with which to determine the existence of "defectiveness" by failing to specifically instruct the jury as to the meaning of "defective," thereby resulting in substantial, prejudicial error due to the misleading guidance in this case provided by the common meaning of "defective." Finally, there is no substantial, competent evidence indicating that the misuse of the crane here was not reasonably foreseeable. Therefore, the court of appeals incorrectly

affirmed the trial court's submission to the jury of an instruction on the defense of misuse. In accordance with the above conclusions, we reverse in part and affirm in part the court of appeals' decision. We remand the case with directions to return it to the district court for a new trial consistent with the views expressed in this opinion.

ERICKSON, J., concurs in part and dissents in part, ROVIRA, C.J., joins in the concurrence and dissent, and VOLLACK, J., joins in Part II of the concurrence and dissent.

VOLLACK, J., specially concurs in part and dissents in part.

Justice ERICKSON concurring in part and dissenting in part:

The court of appeals reversed a judgment entered on a defense verdict and ordered a new trial. *Armentrout v. FMC Corp.*, 819 P.2d 522 (Colo.App.1991). We granted certiorari to review four issues.

1. Whether the "open and obvious" nature of a risk is a defense to a strict liability claim for failure to warn.

2. Whether the "benefit" of a specific design is an affirmative defense to a strict liability claim for defective design under the risk-benefit test.

3. Whether the jury must be instructed on the meaning of "defective" in the context of a strict liability claim for defective design.

4. Whether the court of appeals misapplied *Schmutz v. Bolles*, 800 P.2d 1307 (Colo.1990), in concluding that "the record contains evidence that such misuse may have been unforeseeable by the defendant."

While I concur with the majority's holding that the trial court properly instructed the jury on the open and obvious doctrine in this case, I disagree with the majority's attempt to extend its holding to create a

---

18. In addition, the Armentrouts object to Instruction No. 29 on the grounds that the words "intended" and "expected" incorrectly suggest a subjective, rather than objective, standard for determining whether the misuse was foreseeable. Because we hold that FMC is not entitled to an instruction on the defense of misuse, we will not address this argument.

new "*Camacho* efficacy test" in future open and obvious danger cases. Rather, I believe that, in failure-to-warn cases, the open and obvious doctrine can bar plaintiffs' failure-to-warn claims, even though a warning of a particular obvious danger may make a product safer. I also agree with the majority that a plaintiff always bears the burden of proving that the actual design was unreasonably dangerous and that a jury should be instructed on the definition of "defective" for purposes of design-defect claims. However, I disagree that foreseeability of the harm in obvious danger cases prohibits a jury instruction on the defense of misuse, and with the majority's application of *Schmutz v. Bolles,* 800 P.2d 1307 (Colo.1990) to the facts in this, an obvious danger, case.

I

The petitioner, Lynn Armentrout (plaintiff), brought a personal injury action against the respondent, FMC Corporation (defendant), for injuries he suffered in a work-related accident. Armentrout's wife also asserted a claim for loss of consortium. The defendant is a manufacturer of heavy construction equipment, and built and sold the mobile crane model HC–238A that is the subject of this lawsuit. The model HC–238A mobile crane is forty-eight feet long and consists of two primary components; the crane superstructure which is capable of lifting and moving, equipment and concrete weighing in excess of 120 tons; and the truck base and platform on which the superstructure is attached. *See* Appendix A (photographs of the mobile crane model HC–238A and the site of the pinch-point injury). The superstructure rotates 180 degrees on an axis, thereby creating several "pinch points." [1] One of these pinch points is located on the truck base in an area called the forward luggage carrier. Armentrout was crushed when he was struck by the rotating superstructure while he was standing or kneeling in the forward

luggage carrier with his back to the superstructure.

Armentrout and the crane's operator, Jeffery Wassam, had worked together as a two-man team running various cranes for more than two years. On the date of the accident, the two men were employed by Derr–Gruenewald Construction Company who had purchased the HC–238A mobile crane from FMC. When the mobile crane was delivered, FMC provided instruction manuals that warned of working on the platform on the truck while the crane was in operation, and of the dangers at the pinch points.

The two men, who had been operating the HC–238A mobile crane as a team for five months, were using the crane at a job site for the third consecutive day to move and install 70,000 pound concrete panels. While Wassam was operating the crane, Armentrout was cleaning oil and dirt off of the platform on the truck. At some point, while Wassam was rotating the crane superstructure to pick up another concrete panel, Armentrout either slipped or stepped into the forward luggage carrier, and was crushed at the pinch point when the crane superstructure passed over the luggage carrier on the truck.

The record contains evidence that not only were the oilers instructed not to work on the platform of the truck when the crane was in motion, but also that the crane operators were instructed not to rotate the superstructure of the crane when anyone was on the truck's platform. However, it was the common practice among many oilers to confront the known danger of working within the swing radius of the crane superstructure while it was in operation to simplify the cleaning of the mobile crane. Both Armentrout and Wassam were aware of the dangers of working on the truck's platform, and Armentrout knew the crane was operating at the time he was on the platform.

Following a jury verdict in favor of FMC on all claims, Armentrout appealed to the

---

**1.** A pinch point occurs when the rotating superstructure comes in close proximity to the truck base.

court of appeals alleging various errors. The court of appeals reversed and remanded for a new trial on the following grounds:

    1. It was reversible error for the district court to reject plaintiffs' requested jury instruction that the negligence of third persons is not a defense to defendant's own negligence.

    2. It was reversible error for the district court to exclude reports to FMC of similar accidents as inadmissible hearsay if they are admitted only for the limited purpose of establishing notice to the manufacturer.

Certiorari was not granted to review the order granting a new trial or the reasons stated in the court of appeals decision for ordering a new trial.

## II

    In section II of the majority opinion, the majority rejects, as the rule in Colorado, the open and obvious doctrine. The majority says that the "open and obvious nature of a risk is not necessarily a complete defense to a strict liability failure-to-warn claim." Maj. at 181.[2] Rather, the majority concludes that "the obviousness of the danger and efficacy of the proposed warning are factors which the trial court should consider in determining whether the defen-

dant has a duty to warn the plaintiff" ("*Camacho* efficacy test"). *Id.*[3] Therefore, the majority holds that there is no duty to warn unless there is a substantial likelihood that the proposed warning would have prevented injury to the plaintiff. *Id.* However, the majority determines that because Armentrout failed to prove that a warning decal would have prevented his injury, the majority's newly developed "*Camacho* efficacy test" cannot be applied to the facts of this case.[4] I disagree with the majority's conclusion that the open and obvious doctrine as the applicable no-duty rule in Colorado has been abandoned.

    A danger is either open and obvious, so that a manufacturer is under no legal duty to provide additional warnings even though some warning may have, in some way, reduced the risk, or the danger is not open and obvious. A manufacturer should still be able to rely on the certainty established by the doctrine to bar a plaintiff's failure-to-warn claim in obvious-danger cases. *See Kysor Industrial Corp. v. Frazier,* 642 P.2d 908, 911 (Colo.1982) ("Strict liability is not the equivalent of absolute liability. Because the law does not require a manufacturer to be the virtual insurer of its products, the scope of liability under section 402A is limited.")

**2.** I disagree with the majority's failure to recognize that the open and obvious doctrine in Colorado is not a defense. Rather, the well-established doctrine states that a manufacturer is under *no legal duty* to warn of obvious risks. *See* 3 *American Law of Products Liability 3d,* § 33:25 (1987). This treatise notes that

> [w]here the risks of the product are discernible by casual inspection, such as the danger that a knife can cut, or a stove can burn, the consumer is in just as good a position as the manufacturer to gauge the dangers associated with the product, and nothing is gained by imposing on the manufacturer the duty to warn. Similarly, a manufacturer is not required to provide its machinery with warning devices such as bells or lights only where the danger is obvious.

*Id.* The treatise goes on to note that "the open and obvious doctrine may bar the plaintiff's claim, and not simply be a defense to that claim...." *Id.*

**3.** The "*Camacho* efficacy test" places in the hands of the trial judge the responsibility of determining whether a manufacturer owes a consumer a duty to warn of dangers associated

with the product by weighing the obviousness of the danger with the efficacy of the proposed warning. Maj. at 181. I agree that determination of the duty owed is a question of law, for the court to decide, but it is the law in Colorado that a manufacturer is under no duty to warn of risks that are open and obvious to the reasonable user of the product. *See Davis v. Caterpillar Tractor Co.,* 719 P.2d 324, 327 (Colo.App. 1985) (holding that manufacturer owed no duty to warn of dangerous condition where the existence of that condition was generally known and recognized). *See also Kysor Industrial Corp. v. Frazier,* 642 P.2d 908 (Colo.1982).

**4.** Although Armentrout failed to state at trial that a warning decal would have prevented his injuries, I fail to see when in the future, if viewed with twenty-twenty hindsight and the benefit of the majority's new test, a specific warning proposed by an injured user would not have reduced the risk to the user in some way. It is precisely the benefit of hindsight which allows a user to claim at trial that even though the risk was open and obvious to an ordinary user a warning directed explicitly at him would have prevented his injury.

In *Camacho v. Honda Motor Company,* 741 P.2d 1240 (Colo.1987), we stated that the obviousness of a danger does not mean a product could not be designed to be safer. However, if a product is obviously dangerous, a warning will not lower the risk to a user of that product's dangerous characteristics. Simply because we properly rejected the obvious-danger rule in design-defect cases does not mean that we should now reject it in failure-to-warn cases. Certain dangers are so obvious that no warning would serve to lower the risk or better inform consumers, and consequently, manufacturers have no duty to warn of such dangers.

Warning of a product's dangers serves two distinct purposes. First, a warning may reduce the risk of injury by allowing consumers to be more careful than they would if they were unaware of the risk or danger. Second, product warnings provide information necessary to allow consumers to decide whether or not they wish to confront certain risks regardless of a product's dangerous characteristics.

No legal duty should be imposed on a product manufacturer to provide a warning to a user where the warning conveys only that information which a user would glean from the observation of, or use of, the product. *See Bavuso v. Caterpillar Indus., Inc.,* 408 Mass. 694, 563 N.E.2d 198, 202 (1990) (holding that there is no duty to warn of danger where danger was such that no one who thought about it, certainly no *experienced* equipment operator, could fail to appreciate it). A duty to warn arises only where, as between a manufacturer and a user, an imbalance exists with respect to their relative knowledge of a risk of harm associated with a product that would be eliminated with a proper warning. *See National Bank of Bloomington v. Westinghouse Electric Corp.,* 175 Ill.Dec. 817, 600 N.E.2d 1275 (1992) ("Generally, a duty to warn arises when there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge knows or should know that harm might occur absent a warning."). In this case, in addition to the dangers of the pinch-points being obvious to the ordinary user, Armentrout testified that he knew of the dangers of working on the crane while it was operating and knew of the risks which confronted him in violating the instructions that were provided to him in the operator manuals. There was simply no additional information about the dangers of the pinch points on the HC–238A mobile crane that would have equalized the balance of knowledge as between Armentrout and FMC.

A manufacturer, as a matter of law, not as a matter of fact, owes no duty to warn a reasonable person of an open and obvious danger. The majority, by requiring the trial judge to weigh various factors to determine whether a manufacturer is required to warn of open and obvious dangers, rejects the generally accepted majority rule that there is simply no legal duty to warn of these dangers. *See, e.g., Hawkins v. Montgomery Industries Int'l, Inc.,* 536 So.2d 922 (Ala.1988); *Scheller v. Wilson Certified Foods, Inc.,* 114 Ariz. 159, 559 P.2d 1074 (1976); *Bojorquez v. House of Toys, Inc.,* 62 Cal.App.3d 930, 133 Cal.Rptr. 483 (1976); *Babine v. Gilley's Bronco Shop, Inc.,* 488 So.2d 176 (Fla.App.1986); *Weatherby v. Honda Motor Co.,* 195 Ga. App. 169, 393 S.E.2d 64 (1990); *Miller v. Dvornik,* 149 Ill.App.3d 883, 103 Ill.Dec. 139, 501 N.E.2d 160 (1986); *Maguire v. Pabst Brewing Co.,* 387 N.W.2d 565 (Iowa 1986); *Long v. Deere & Co.,* 238 Kan. 766, 715 P.2d 1023 (1986); *Fiorentino v. A.E. Staley Mfg. Co.,* 11 Mass.App. 428, 416 N.E.2d 998 (1981); *Mach v. General Motors Corp.,* 112 Mich.App. 158, 315 N.W.2d 561 (1982); *Dulik v. K–Mart Discount Stores, Inc.,* 57 Ohio App.3d 61, 566 N.E.2d 710 (1989); *Reece v. Lowe's of Boone, Inc.,* 754 S.W.2d 67 (Tenn.App.1988); *Beans v. Entex, Inc.,* 744 S.W.2d 323 (Tex.App. 1988); *Baughn v. Honda Motor Co.,* 107 Wash.2d 127, 727 P.2d 655 (1986); *Parker v. Heasler Plumbing & Heating Co.,* 388 P.2d 516 (Wyo.1964). *See also* 3 *American Law of Products Liability 3d* § 33:25 (1987) (cataloging cases and noting that there "is generally no duty to warn where the danger is open and obvious or apparent, and the product is not defectively de-

signed or manufactured"); James A. Henderson, Jr. & Aaron D. Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U.L.Rev. 265, 280–82 (1990) (noting that the "general rule in American products law is that defendants owe no duty to warn of risks that are obvious to normal, reasonable users and consumers"). In my view, a plaintiff should be required to prove that a warning is necessary to reduce the risk of injury, *and* that a warning would have reduced the risk *or* provided a user with an opportunity to evaluate the risk confronting him.[5]

I also view the majority's reliance on *Union Supply Company v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978), *Camacho v. Honda Motor Company*, 741 P.2d 1240 (Colo.1987), and *Anderson v. M.W. Kellogg, Company*, 766 P.2d 637 (Colo.1988) as misplaced. *Union Supply* addressed defenses that were available to a defendant in both design-defect and failure-to-warn actions. Although *Union Supply* questioned the applicability of the "open and obvious defense" to both of these strict product liability claims for relief, it did not resolve the applicability of the doctrine in either design-defect or failure-to-warn cases.[6] In *Camacho*, we addressed, and properly rejected, the open and obvious doctrine in design-defect cases. In *Anderson*, we used language contained in *Camacho* while addressing a products liability claim which was barred by our now repealed statute of repose.

While the language in each of the cited cases lends support to the majority's determination that the open and obvious danger of a product is not a complete bar to failure-to-warn claims, we have never affirmatively adopted the view stated by the majority in this case.[7] Rather, the majority's

5. *See, e.g.,* James A. Henderson, Jr. & Aaron D. Twerski, *Products Liability, Problems and Process* 387–88 (1987) ("Under every approach taken in every jurisdiction, the plaintiff must show that the defendant's failure to warn was the proximate cause of the plaintiff's injury. To do that, the plaintiff must show that if an adequate instruction or warning had been given, the addressee (typically the product user or consumer) would have acted differently in a manner that would have reduced or avoided the plaintiff's injury."); James A. Henderson, Jr., *Manufacturers' Liability for Defective Product Design: A Proposed Statutory Reform*, 56 N.C.L.Rev. 625, 630 n. 26 (1978) (noting that under a statutory proposal sponsored by the National Products Liability Council, there is "a requirement, in failure to warn cases ... that the plaintiff prove a definite causal connection between the alleged failure to warn and the injuries suffered").

6. The majority now reads *Union Supply* as rejecting the open and obvious doctrine as a complete bar in failure-to-warn cases. *See* maj. at 9n. *Union Supply* recognized that the origin of the open and obvious doctrine was the case of *Campo v. Scofield*, 301 N.Y. 468, 95 N.E.2d 802 (1950). *Campo*, a *design-defect* case was overruled in *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976), another *design defect* case. In my view, the concern we exhibited in *Union Supply* was limited to design defect cases. This concern is evidenced by our rejection of the open and obvious doctrine in *Camacho*, as well as our note in *Union Supply* that "the Washington Court of Appeals has commented: ' * * * [T]he manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage *misdesign* rather than encouraging it in its obvious form.' " *Union Supply*, 196 Colo. at 175, 583 P.2d at 284 (quoting *Palmer v. Massey Ferguson, Inc.*, 3 Wash.App. 508, 476 P.2d 713 (1970)) (emphasis added).

7. The majority claims that while the instruction to the jury in this case, which was based upon CJI–Civ.3d 14:20, was correct, future cases may require the trial court to modify the instruction pursuant to the newly developed "*Camacho* efficacy test." *See* maj. at 181. In so stating, the majority abandons a well-established no-duty rule that is currently the law in Colorado. CJI–Civ.3d 14:20 currently provides:

A product is defective and unreasonably dangerous if it is not accompanied by sufficient warnings or instructions for use. To be sufficient, such warnings or instructions for use must adequately inform the ordinary user of any specific risk of harm which may be involved in any intended or reasonably expected use.

However, if a specific risk of harm would be apparent to an ordinary user from the product itself, a warning of or instructions concerning that specific risk of harm is not required.

*See also* CJI–Civ.3d 14:20 (1989). This instruction recognizes that this court has never rejected the open and obvious doctrine. Rather, this instruction requires that a jury determine whether or not a specific risk of harm was obvious to an ordinary user. If a risk is obvious, a manufacturer is not required (has no duty) to provide a warning or instructions.

current view, that this court has long recognized that the open and obvious rule is not a complete bar to a plaintiff's failure-to-warn claim, is based primarily on this court's discussion of the doctrine in *Camacho*. Because I do not view *Camacho* as rejecting the open and obvious rule in failure-to-warn cases, I disagree with the majority's conclusion and expansion of *Camacho*.

*Camacho* involved a situation in which Honda already produced a design option for its motorcycles which may have made the product safer. In ruling on the plaintiff's failure-to-warn claim, a divided court said that where a design option has been made available by the manufacturer that may reduce the risk of injury to purchasers of a product, manufacturers may be obligated to disclose the availability of that option to purchasers. *Camacho*, 741 P.2d at 1248. Requiring affirmative disclosure of the availability of design options is not the same as requiring a manufacturer to warn of obvious dangers.

In *Camacho*, we did not say that Honda was required to warn Camacho about the obvious dangers of riding a motorcycle even if such a warning would have reduced the risk to Camacho. Nor did we reject the open and obvious doctrine in failure-to-warn cases by requiring that a trial court decide the duty issue on a case by case basis. In my view, the holding of *Camacho* simply does not apply to the facts in this case. Like Camacho's decision to ride a motorcycle, Armentrout was well aware of the danger he exposed himself to when he worked on the crane's stationary platform while the crane's superstructure was rotating. However, unlike Honda, FMC did not offer safety options, the disclosure of which would have lowered the risk to Armentrout. Because *Camacho* did not limit *or modify* the traditional no-duty rule, but rather provided for an exception to the rule which is not applicable under the facts

of this case, we should not now read it as rejecting the traditional no-duty rule.

Armentrout claims that by failing to install a warning bell or light on the HC–238A mobile crane, FMC breached its duty to *warn* him that the superstructure was in motion. Armentrout's argument mischaracterizes his design-defect claim as a failure-to-warn claim. A warning device like that sought by Armentrout would not provide a warning of the danger of pinch points since that danger is obvious and was known to Armentrout. Rather, the warning device Armentrout seeks is a design alteration that could possibly make the crane less dangerous as a whole.[8] The majority correctly analyzes that part of Armentrout's claims under Armentrout's design-defect claim. *See, e.g., Weatherby v. Honda Motor Co.*, 195 Ga.App. 169, 393 S.E.2d 64 (1990); *FMC Corp. v. Brown*, 526 N.E.2d 719 (Ind.App.1988), *aff'd*, 551 N.E.2d 444 (Ind.1990); *Braxton v. Georgia Pacific Corp.*, 419 So.2d 125 (La.App.1982); *Glavin v. Baker Material Handling Corp.*, 144 Mich.App. 147, 373 N.W.2d 272 (1985). The jury instruction relating to a claim based on defective design does not encompass the open and obvious doctrine. *See* CJI–Civ.3d 14:19 (1989).

I concur in the result the majority reaches in section II. However, I disagree that we should reject the open and obvious doctrine by adopting the *"Camacho* efficacy test" in failure-to-warn cases. In my view, it always has been, and should still be, the rule in Colorado that manufacturers owe no legal duty to warn of open and obvious dangers. Additionally, I believe that it is error to characterize a design-defect claim as a failure-to-warn claim.

### III

The majority concludes that FMC presented "no competent evidence which would support a conclusion that the prod-

8. For example: A forklift moving in reverse is obviously dangerous. A dock worker knows that standing behind a forklift while it is moving in reverse would subject him to potentially severe injury. A buzzer warning a dock worker that a forklift is moving in reverse may be a desirable design feature lowering the obvious danger by instructing the worker to get out of the way. However, a buzzer does not change the fact that standing behind a moving forklift is obviously dangerous.

uct misuse was unforeseeable." Maj. at 189. Therefore, relying on *Schmutz v. Bolles,* 800 P.2d 1307 (Colo.1990), the majority holds that the court of appeals improperly affirmed the district court's submission of a misuse instruction to the jury. Maj. at 189.[9] In my view, the court of appeals correctly upheld the district court's instruction on the defense of misuse. The question of misuse in this case was properly presented for determination by the jury. I dissent from the majority's holding that the court of appeals erred in affirming the district court's submission of a misuse instruction.

Misuse is a defense to a product liability action under the doctrine of strict liability, but only if the misuse is unforeseeable by the manufacturer. *Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322, 1325 (Colo.1986). Where a warning is given, the seller may reasonably assume that it will be read and heeded. *Id.* at 1326. In *Schmutz,* we interpreted *Uptain,* and said that a defendant who could reasonably foresee the possibility of misuse is not entitled to the defense. *Schmutz,* 800 P.2d at 1316. The majority relies on this statement and finds no competent evidence in the record which would support the conclusion that the product misuse was unforeseeable. Maj. at 189. Therefore, the majority states that FMC is not entitled to the benefit of the defense and the jury instruction on misuse was error. The majority opinion expands *Schmutz* to cover open and obvious danger cases so that the defense of misuse will no longer be available. In *Schmutz,* we held that the misuse defense was not properly submitted to the jury where the manufacturer of a cranial drill received over thirty reports of a latent malfunction due to improper cleaning and that failure to properly clean the drill might injure *innocent non-users* of the product. In my view, *Schmutz* does not address the open and obvious danger issue, and should not be interpreted as controlling on that issue.

The majority also rejects FMC's argument that Armentrout's conduct while working on the HC–238A mobile crane was unforeseeable. FMC argues that the warning provisions in the operators manual entitles them to the presumption of unforeseeability that we articulated in *Uptain.* In rejecting FMC's argument, the majority distinguishes *Uptain* from the present case by finding that, unlike *Uptain* where an adequate warning reached the user, in this case, there "is evidence that Armentrout did not receive the warnings in the manual and such evidence places in question the adequacy of the warnings provided the users of the crane." Maj. at 188. The majority reasons that there is no warning which Armentrout could have read or heeded and thus, the presumption set forth in *Uptain* does not apply. *Id.* I disagree.

Our decision in *Uptain* held that "the question of whether it was foreseeable that a user of [a caustic cleaning compound] would wring out a cloth with her bare hands was properly reserved for jury determination...." *Uptain,* 723 P.2d at 1326. In *Uptain,* we stated that where a user of a product receives a warning, he is presumed to heed that warning. Whether Armentrout actually received the warnings in the manual is not dispositive of the question of the adequacy of warnings for purposes of the *Uptain* presumption. It is undisputed that Armentrout *knew* the dangers of working on the truck's platform on the mobile crane while the crane was being operated. In this case, an adequate warning of the danger of injury by being crushed at the crane's pinch points was provided by Armentrout's employer, his past work on the crane and truck, his current work on the crane and truck, and by *plain view of the crane in operation.* In my view, *Schmutz* does not stand for the proposition that any manufacturer that is

---

**9.** The instruction in question was based on CJI–Civ.3d 14:22 (1989), which states:

A manufacturer of a product is not legally responsible for injuries caused by a product if: (1) the product is used in a manner or for a purpose other than that which was intended and that use could not reasonably have been expected by the manufacturer; and (2) such use rather than a defect, if any, in the product caused the plaintiffs' claimed injuries.
CJI–Civ.3d 14:22 (1989).

on notice of prior incidents of product misuse, or warns against product misuse, cannot defend against a product liability claim on the basis of that misuse when the danger confronted by the consumer is open and obvious. Rather, in open and obvious danger cases, the jury could rationally decide that a manufacturer should be able to rely on the user to take reasonable precautions to protect himself against a harm which is obvious to a reasonable person, and the jury should receive an appropriate instruction.

At trial, FMC presented substantial evidence that Armentrout's work on the HC–238A mobile crane violated generally accepted operating procedures and was an unsafe practice. Accordingly, whether or not Armentrout's conduct of working on the HC–238A mobile crane was misuse, and if it was, whether that misuse was foreseeable to FMC are questions for the jury. *See Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322 (Colo.1986); *Brown v. Sears, Roebuck & Co.,* 136 Ariz. 556, 667 P.2d 750 (1983). I dissent from that portion of the majority opinion that holds the jury was improperly instructed on the misuse defense.

## IV

In conclusion, while I concur with the majority's holding that the trial court properly instructed the jury on the open and obvious doctrine in this case, I disagree with the majority's attempt to extend its holding to create a new *"Camacho* efficacy test"* in future open and obvious danger cases. Rather, I believe that, in failure-to-warn cases, the open and obvious doctrine can bar plaintiffs' failure-to-warn claims, even though a warning of a particular obvious danger may make a product safer. I also agree with the majority that a plaintiff always bears the burden of proving that the actual design was unreasonably dangerous and that a jury should be instructed on the definition of "defective" for purposes of design-defect claims. However, I disagree that foreseeability of the harm in obvious danger cases prohibits a jury instruction on the defense of misuse, and with the majority's application of *Schmutz v. Bolles,* 800 P.2d 1307 (Colo.1990) to the facts in this obvious danger case.

I am authorized to say that Chief Justice ROVIRA joins in this concurrence and dissent, and Justice VOLLACK joins in part II of this concurrence and dissent.

## APPENDIX A

SITE OF INJURY

Justice VOLLACK specially concurring in part and dissenting in part:

I join in part II of Justice Erickson's concurrence and dissent that in failure-to-warn cases the open and obvious doctrine can bar plaintiffs' failure-to-warn claims even though a warning of a particular obvious danger may make a product safer. Accordingly, I find it unnecessary to reach the issues regarding the adequacy of instructions or the misuse defense because FMC owed no duty to Armentrout in this case.

I dissent from part III of the majority opinion which places on plaintiffs a burden of proving the unreasonable dangerousness of a product using risk-benefit analysis. Maj. at 181–83. Risk-benefit analysis should play no role in this case, which concerns the design of a mobile crane. As I stated in *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240, 1249 (Colo.1987) (Vollack, J., dissenting),

> the risk-benefit test ... applied in *Ortho* is an appropriate test for products such as drugs, because their danger "is defined primarily by technical, scientific information," and because some drugs are unavoidably unsafe in some respect. A consumer of drugs cannot realistically be expected to foresee dangers in prescribed drugs which even scientists find to be complex and unpredictable.

*Id.* at 1251 (citing *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410, 414 (Colo. 1986). Like the motorcycle purchaser in *Camacho,* Armentrout had knowledge of the dangers of working on the crane's platform while the crane was in operation. *Id.* I thus conclude, as I did in *Camacho,* that the risk-benefit test is not the proper test to employ in this case. *Id.*